[No. B236687. Second Dist., Div. Two. Dec. 18, 2012.]

CHIH TEH SHEN, Plaintiff and Respondent, v.
RANDALL MILLER, Defendant and Appellant.

**COUNSEL**

Weingarten Brown, Alex M. Weingarten and Jeffrey K. Logan for Defendant and Appellant.

Law Offices of John R. Walton, John R. Walton and Walter W. Moore for Plaintiff and Respondent.

## OPINION

**CHAVEZ, J.**—Appellant Randall Miller (Miller) appeals from an order denying his motion to disqualify Attorney John R. Walton and his firm Law Offices of John R. Walton, P.C. (collectively, Walton), in three related actions. Walton represents respondent Chih Teh Shen (Shen) in the related actions, all of which involve Miller and Arnon Development Group, Inc. (Arnon), a corporation owned by Miller and Shen as 50/50 shareholders. In his motions to disqualify Walton, Miller argued that Walton should be disqualified because, as Shen's counsel, he is prosecuting claims on behalf of Arnon in one action while simultaneously prosecuting claims against Arnon in another matter. The trial court denied Miller's motion to disqualify Walton on the ground that there was no basis to infer an attorney-client relationship between Walton and Arnon. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Arnon is a commercial real estate development corporation formed in 2005. Miller and Shen are the only shareholders of Arnon. They are also copresidents and directors of the company.

On July 6, 2009, Shen filed a complaint against Miller, captioned *Shen v. Miller* (Super. Ct. L.A. County, No. SC103845) (the individual action). Shen alleged that Miller attempted to force Shen to accept an underpriced buyout or face dissolution of the corporation. Shen alleged that Miller thereafter commenced numerous actions in violation of his fiduciary duties to Arnon and to Shen, including eliminating Shen's access to Arnon's electronic files; eliminating Shen's access to Arnon's banking accounts; attempting to remove Shen's signatory authority with respect to a major project in which Arnon was involved (Sixteenth Street Medical Center, LLC); operating the business as if Shen were no longer an officer and director; locking Shen out of the Arnon offices; and purporting to unilaterally dissolve Arnon. Shen filed a first and a second amended complaint, the latter is the operative complaint.[1]

On January 26, 2010, Miller filed a verified petition for court supervision of voluntary winding up proceeding (the winding up proceeding), requesting judicial supervision of the winding up of Arnon. The trial court determined that the individual action and the winding up proceeding were related cases within the meaning of California Rules of Court, former rule 804.[2]

---

[1] Shen later filed amendments to the second amended complaint, adding Miller's father and a former Arnon employee (Angela Yee) as defendants.

[2] California Rules of Court, former rule 804 has been renumbered and is now rule 3.300.

On August 11, 2010, the trial court granted Miller's petition for judicial supervision of the winding up of Arnon, and ordered both notice to creditors of Arnon and presentation of claims.

On or about December 7, 2010, Shen filed notice of creditors' claims in the winding up proceeding. Among Shen's claims were profits, management fees, receivables, unused vacation and benefits, intangible assets, goodwill, and other things.

On May 3, 2011, Walton was substituted as counsel of record for Shen in both the individual action and the winding up proceeding.

On January 7, 2011, Shen filed a complaint derivatively on behalf of Arnon captioned *Shen v. Sixteenth Street Medical Center, LLC* (Super. Ct. L.A. County, No. SC112925) (the derivative action). Walton was named as counsel for Shen. Shen alleged claims for declaratory relief, seeking a declaration that Arnon is entitled to 20 percent class B membership in Sixteenth Street Medical Center, LLC, and another limited liability company created by Arnon. Shen sought declarations that Arnon is entitled to fees resulting from its interest in these LLC's.

In the derivative action, Shen alleged that he is a 50 percent shareholder of Arnon, and that he will fairly represent the interests of Arnon in the proceeding. Shen further alleged that the board of Arnon is currently incapable of making a decision because, pursuant to the bylaws, consent by both directors is required. In addition, Shen alleged that Miller is incapable of making a disinterested decision regarding the litigation, because he is one of the alleged wrongdoers and is manager of the two defendant LLC's.

On June 9, 2011, Shen filed a notice of related case, indicating that the derivative action is related to the individual action and the winding up proceeding. On July 7, 2011, Shen filed a first amended complaint in the derivative action adding Miller, Miller's father, Angela Yee, and Miller's companies (Nautilus Group, Inc., and Nautilus Group 16th Street LLC) as defendants in the derivative action. The first amended complaint in the derivative action added a cause of action for breach of fiduciary duty against Miller, Sixteenth Street Medical Center, LLC, Miller's father and Angela Yee.

On August 10, 2011, Miller filed a motion for disqualification of Walton in the individual action, the winding up proceeding and the derivative action. Miller argued that Walton should be disqualified because, as Shen's counsel, he is prosecuting claims on behalf of Arnon in the derivative action while simultaneously prosecuting claims against Arnon in the winding up proceeding.

On August 8, 2011, Shen filed another action, for declaratory relief, captioned *Shen v. Arnon Development Group, Inc.* (Super. Ct. L.A. County, No. SC113713). (the declaratory relief action). Walton was named as counsel of record for Shen. Through this action, Shen sought a declaration that he is entitled to at least 50 percent of Arnon's assets, after payment to creditors, subject to equitable allocation by the court. On August 16, 2011, Shen filed a notice of related case stating that the declaratory relief action is related to the individual action, the winding up proceeding, and the derivative action.

On August 19, 2011, Miller filed an amended notice of motion identifying the declaratory relief action as an additional basis for the disqualification of Walton.

On September 9, 2011, Shen filed papers opposing the motions to disqualify. Shen argued that Walton had never been retained by Arnon, never provided legal advice to Arnon, and had never been paid by Arnon. In sum, Shen argued that there is no attorney-client relationship between Walton and Arnon.

On September 22, 2011, the trial court issued a tentative ruling denying Miller's motion for disqualification of Walton. The court concluded that there was no basis to infer an attorney-client relationship between Walton and Arnon: "[A]lthough Mr. Walton's firm did file the Complaint in the shareholder derivative action on behalf of Shen and [essentially] Arnon, the Court finds that the distinction between a 'client' and a 'real party in interest' is important in the analysis of this motion. Again, taking judicial notice of the Complaint in the shareholder derivative action, as well as the materials in the file in this case it is apparent that Arnon had no part in the filing of the shareholder derivative action, and would likely not join forces with Shen, due to the disputes between Shen and the other shareholders, officers, and directors of Arnon. Ultimately, there is no basis for this Court to infer that an attorney-client relationship ever arose between Mr. Walton's firm and Arnon such that the firm is concurrently representing two 'clients' with adverse interests." The court also noted: "[B]ecause Shen is at odds with Miller, it is likely that Arnon will either decide not to pursue the shareholder derivative action, or will obtain its own counsel in these four cases. Thus, it is unlikely that an attorney-client relationship between Arnon and the Walton firm will ever arise."

After argument on the motions, the trial court stated that the tentative ruling would stand as the order of the court.

On October 13, 2011, Miller filed notices of appeal from the order denying the motions for disqualification filed in the individual action, the winding up proceeding, and the derivative action. The matters were consolidated for the purposes of this appeal.

## DISCUSSION

### I. *Standard of review*

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion. [Citation.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143–1144 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee Oil*).)

### II. *Legal principles related to disqualification motions*

██ A motion to disqualify a party's counsel may implicate several important interests. (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1144.) Thus, "judges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice." (*Ibid.*) Specifically, depending on the circumstances, "a disqualification motion may involve such considerations as a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion. [Citations.]" (*Id.* at p. 1145, fn. omitted.) However, "determining whether a conflict of interest requires disqualification involves more than just the interests of the parties." (*Ibid.*) "The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." (*Ibid.*)

██ "A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner

connected with a judicial proceeding before it, in every matter pertaining thereto.' [Citations.]" (*SpeeDee Oil, supra,* 20 Cal.4th at p. 1145.)

■ California courts have developed distinct tests for representations involving conflicting interests on the part of an attorney. (*Flatt v. Superior Court* (1994) 9 Cal.4th 275, 283 [36 Cal.Rptr.2d 537, 885 P.2d 950] (*Flatt*).) Where an attorney's potentially conflicting representations are simultaneous, "[t]he primary value at stake . . . is the attorney's duty—and the client's legitimate expectation—of *loyalty* . . . ." (*Id.* at p. 284.) In such cases, the rule of disqualification is a *"per se* or 'automatic' one." (*Ibid.*)

In the matter before us, the trial court determined, based on undisputed evidence, that an attorney-client relationship never arose between Walton and Arnon, thus no conflicting representation exists. Generally, " '[t]he question of whether an attorney-client relationship exists is one of law. [Citations.]' [Citation.]" (*Blue Water Sunset, LLC v. Markowitz* (2011) 192 Cal.App.4th 477, 488 [122 Cal.Rptr.3d 641] (*Blue Water*).)

III. *Walton does not represent Arnon in the derivative action*

Miller's argument that Shen's lawyers should be disqualified is based on Miller's position that Walton's client in the derivative action is Arnon. Because Walton represents Arnon in the derivative action, Miller argues, his position adverse to Arnon in the related litigation should result in automatic disqualification. (*Flatt, supra,* 9 Cal.4th at p. 284.)

■ Disqualification is not proper unless an attorney-client relationship exists between Walton and Arnon. (See *Koo v. Rubio's Restaurants, Inc.* (2003) 109 Cal.App.4th 719, 729 [135 Cal.Rptr.2d 415] (*Koo*) [" 'Before an attorney may be disqualified from representing a party in litigation because his representation of that party is adverse to the interest of a current or former client, it must first be established that the party seeking the attorney's disqualification was or is "represented" by the attorney in a manner giving rise to an attorney-client relationship. [Citations.]' "].)[3] "The burden is on the

---

[3] "Generally, before the disqualification of an attorney is proper, the complaining party must have or have had an attorney-client relationship with that attorney." (*Dino v. Pelayo* (2006) 145 Cal.App.4th 347, 352 [51 Cal.Rptr.3d 620].) Miller concedes that he has never had an attorney-client relationship with Walton. However, Miller cites *Kennedy v. Eldridge* (2011) 201 Cal.App.4th 1197, 1204 [135 Cal.Rptr.3d 545] for the proposition that orders disqualifying counsel are not always the product of motions by an attorney's present or former client. (See *Blue Water, supra,* 192 Cal.App.4th at pp. 485–486.) Shen does not contest Miller's standing to bring the underlying motion to disqualify counsel, therefore we will not address the issue further.

party seeking disqualification to establish the attorney-client relationship. [Citation.]" (*Koo*, at p. 729.) Generally, the formation of an attorney-client relationship is a question of fact. (*Flatt, supra*, 9 Cal.4th at p. 281.) "Intent and conduct are critical to the formation of an attorney-client relationship. [Citation.]" (*Canton Poultry & Deli, Inc. v. Stockwell, Harris, Widom & Woolverton* (2003) 109 Cal.App.4th 1219, 1228 [135 Cal.Rptr.2d 695].) An attorney-client relationship can only be created by contract, express or implied. (*Koo, supra*, at p. 729.) A formal retainer and fee agreement is not necessary. " ' "When a party seeking legal advice consults an attorney at law and secures that advice, the relation of attorney and client is established *prima facie*." [Citation.]' " (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1148.) Miller presents no facts suggesting the existence of an express or implied agreement between Arnon and Walton for the provision of legal advice.

While Miller implicitly acknowledges that Walton has no formal attorney-client relationship with Arnon, Miller claims that in prosecuting the derivative action, Walton represents the interests of the corporation. In support of this argument, Miller points to Corporations Code section 800, subdivision (b), which specifies that a derivative action is brought "in right of" a corporation. Miller further cites case law explaining that a derivative claim is "a property right that belongs to the corporation. [Citations.]" (*Cotton v. Expo Power Systems, Inc.* (2009) 170 Cal.App.4th 1371, 1380 [89 Cal.Rptr.3d 112].) " 'If successful, a derivative claim will accrue to the direct benefit of the corporation and not to the stockholder who litigated it. [Citations.]' [Citation.]" (*Ibid.*) Because the derivative action is a representative action brought on behalf of the corporation, the shareholder acts "in a fiduciary capacity substantially as guardian *ad litem* for the corporation." (*Hogan v. Ingold* (1952) 38 Cal.2d 802, 812 [243 P.2d 1].)

While the basic principles of law cited by Miller are correct, Miller fails to cite a case in which it has been held that the attorney for a shareholder prosecuting a derivative action on behalf of a corporation enters an attorney-client relationship with the corporation simply by filing the derivative action.

In addressing this issue, it is helpful to review the basic nature of a shareholder derivative action.

In order for a shareholder to have standing to bring a derivative action, the shareholder plaintiff must allege that it is a record or beneficial shareholder of the corporation; that it presented the basis of the litigation to the corporation's board; and that it tried to secure from the board such action as the plaintiff desires. (Corp. Code, § 800, subd. (b)(1) & (2).) Demand on

the board is excused only when the plaintiff sufficiently alleges that the demand would have been futile. (Corp. Code, § 800, subd. (b)(2).) Thus, a shareholder may only bring a derivative suit on behalf of the corporation if the corporation has refused to pursue the claim. In bringing the derivative action, the shareholder's attorney is acting against the corporation's wishes.

Nevertheless, should the shareholder prevail in the derivative action, the corporation is the ultimate beneficiary. (*Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1003 [84 Cal.Rptr.3d 642] (*Patrick*).) Therefore, the corporation must be joined in the action. Normally, the corporation is joined as a nominal defendant because of "its refusal to join the action as a plaintiff. [Citation.]" (*Id.* at p. 1004.) In other words, in a shareholder derivative suit, " '[t]he corporation has traditionally been aligned as a defendant because it is in conflict with its stockholder about the advisability of bringing suit . . . .' [Citation.]" (*Ibid.*) However, "[i]n a real sense, the only claim a shareholder plaintiff asserts against the nominal defendant corporation in a derivative action is the claim the corporation has failed to pursue the litigation." (*Ibid.*)

In essence, the corporation that is the subject of the derivative claim is generally a nominal party only. " 'Because the claims asserted and the relief sought in [the derivative] complaint would, if proven, advance rather than threaten the interests of the nominal defendant[], the nominal defendant[] must remain neutral in [the] action.' [Citation.]" (*Patrick, supra,* 167 Cal.App.4th at p. 1007.)

In this matter, Arnon is named in the derivative action both as a derivative plaintiff, and as a nominal defendant. However, Walton is listed as attorney for respondent Shen only. If Walton represented Arnon, there would be no need for a derivative action, as the corporation itself would be pursuing Shen's claims.

 Miller has presented no facts suggesting the formation of an attorney-client relationship between Walton and Arnon. Arnon has not sought or obtained legal advice from Walton at any time. Nor has Miller presented any authority for the proposition that Walton's filing of the derivative action as Shen's attorney is sufficient to create an attorney-client relationship between Walton and Arnon. Because Miller has failed to meet his burden of proving that an attorney-client relationship exists between Walton and Arnon, Miller's motion for disqualification of Walton was properly denied.

IV. *The cases cited by Miller are distinguishable*

Miller draws our attention to numerous cases which, he claims, support his position that Walton should be disqualified from representing Shen in the related cases. As set forth below, all are distinguishable.

The first case Miller relies upon is *Blue Water, supra*, 192 Cal.App.4th 477. Blue Water, a 50 percent shareholder of three limited liability companies, filed a derivative action on behalf of the LLC's against the other shareholder, Markowitz, and a limited liability company owned exclusively by Markowitz (Four Star). Markowitz filed a cross-complaint and sued derivatively and individually against Blue Water and the LLC's. Kurtz represented Markowitz and Four Star, and Sandler represented the LLC's. (*Id.* at pp. 482–483.)

Kurtz prepared demurrers on behalf of Markowitz, a codefendant, Four Star, and the LLC's. At the hearing on the demurrers, Kurtz appeared on behalf of Markowitz and Four Star, and made a special appearance on behalf of the LLC's because Sandler was not in attendance. (*Blue Water, supra*, 192 Cal.App.4th at p. 483.)

Under these factual circumstances, this court determined that Kurtz was subject to automatic disqualification. Specifically, ". . . Kurtz's preparation of the demurrer and special appearances on behalf of the limited liability companies at the demurrer hearing created an attorney-client relationship and he owed them a fiduciary duty, including a duty of utmost loyalty." (*Blue Water, supra*, 192 Cal.App.4th at pp. 487–488.) "We would reach the same conclusion even if he only made an appearance." (*Id.* at p. 488.)

Four Star and Markowitz had interests adverse to the LLC's. Thus, ". . . Kurtz knowingly agreed to represent conflicting interests at the demurrer hearing." (*Blue Water, supra*, 192 Cal.App.4th at p. 490.) Therefore, we concluded, he could not avoid the rule of automatic disqualification. (*Ibid.*)

*Blue Water* is factually distinguishable from the matter presently before us. Here, there is no indication that Walton ever made an appearance on behalf of Arnon or filed a demurrer or any other motion on behalf of Arnon. Furthermore, it should be noted that in *Blue Water*, neither of the attorneys representing the two 50 percent shareholders was held to have an attorney-client relationship with the LLC's merely because he filed derivative actions involving the LLC's.

*Gong v. RFG Oil, Inc.* (2008) 166 Cal.App.4th 209 [82 Cal.Rptr.3d 416] (*Gong*) is also distinguishable. There, RFG was owned by Jeffrey Gong (holding 49 percent of the corporate stock) and David Gong (holding 51 percent of the corporate stock). When the brothers had a falling out, RFG terminated Jeffrey and forced him to resign. (*Id.* at p. 212.) Jeffrey sued David and RFG for involuntary dissolution, declaratory relief, breach of

fiduciary duty, and wrongful discharge. (*Ibid.*) Jeffrey challenged David's counsel's ability to represent both David and RFG, and filed a disqualification motion when new counsel substituted in to represent both David and RFG. (*Id.* at p. 213.) The Court of Appeal determined that Jeffrey's position was correct, since David and RFG "are not 100 percent aligned on all issues in the litigation." (*Id.* at p. 215.) *Gong* is distinguishable because the law firm representing David and RFG did not deny that it was the firm's intention to represent both parties. The law firm specifically substituted in as counsel for both parties, and never denied that it had an attorney-client relationship with both the majority shareholder and the corporation itself. (*Id.* at p. 213.) Here, in contrast, Walton is not attorney of record for Arnon. In fact, Walton expressly disavows any attorney-client relationship with Arnon, and Miller has failed to set forth facts suggesting that such a relationship exists.

Miller also cites *Forrest v. Baeza* (1997) 58 Cal.App.4th 65 [67 Cal.Rptr.2d 857] (*Forrest*). In *Forrest*, the attorney who was the subject of the disqualification motion was "simultaneously representing the Forrests and the corporations they [were] accused of embezzling from and subjecting to penalties for tax fraud." (*Id.* at p. 74.) The *Forrest* court acknowledged that case law "forbids dual representation of a corporation and directors in a shareholder derivative suit, at least where, as here, the directors are alleged to have committed fraud. [Citations.]" (*Ibid.*) Here, in contrast, Walton does *not* simultaneously represent the corporation and a director. As set forth above, he has no attorney-client relationship with the corporation at all.

Finally, Miller cites *Jacuzzi v. Jacuzzi Bros., Inc.* (1963) 218 Cal.App.2d 24 [32 Cal.Rptr. 188] (*Jacuzzi*). In *Jacuzzi*, the defendants, including the corporation, argued that an attorney (Gray) could not represent the minority shareholders in this action by the minority shareholders against the corporation. Gray had represented the corporation for 24 years and had served as chairman of the corporation's board of directors. However, Gray averred that he had not obtained any confidential information during that time relating to the subject matter of the present action. (*Id.* at pp. 27–28.) The trial court found that no conflict existed, and the Court of Appeal affirmed. The court explained that the minority shareholders were acting as guardians ad litem for the corporation, and were bringing the suit for the benefit of the corporation. The court concluded, "Since Gray here acts for the benefit of the corporation he previously represented it is apparent he is not representing an interest adverse to the corporation . . . ." (*Id.* at p. 29.)

*Jacuzzi* is inapposite. Walton has not represented Arnon in the past, nor does he currently represent the corporation. Thus there is no question as to whether he will be called upon to breach a confidence entrusted to him by the corporation. He has never been in an attorney-client relationship with Arnon, thus he has not been in a position to receive such client confidences.

Miller makes much of the language in several cases, including *Jacuzzi*, indicating that shareholders bringing a derivative action act as guardians ad litem for the corporation. (See *Jacuzzi, supra*, 218 Cal.App.2d at p. 29; see also *Hogan v. Ingold, supra*, 38 Cal.2d at p. 809; *Whitten v. Dabney* (1915) 171 Cal. 621, 630–631 [154 P. 312] [describing shareholder's position in a derivative action as that of "a trustee pure and simple, seeking in the name of another a recovery for wrongs that have been committed against that other"].) Miller argues that "the guardian *ad litem* cannot even be considered a party to the cause. [Citations.]" (*Whitten, supra*, at p. 631.)

Miller contends that, because a shareholder acts as a guardian ad litem for the corporation, the exercise of identifying the attorney's client in a derivative action is no different from other engagements in which an organization acts through an authorized representative. According to Miller, Shen's role as guardian ad litem for the corporation automatically renders his attorney, Walton, counsel for the corporation.

It is Shen, not Walton, who has stepped into the role of guardian ad litem for Arnon.[4] Miller has provided no case law indicating that a lawyer for a guardian ad litem automatically has an attorney-client relationship with the guardian ad litem's ward.

Miller cites *Williams v. Superior Court* (2007) 147 Cal.App.4th 36, 51 [54 Cal.Rptr.3d 13] (*Williams*), for the proposition that the role of a guardian ad litem is to oversee "the attorney's work to ensure the child's legal interests are protected." *Williams* involved a father's objection to the court's appointment of his children's maternal grandmother as guardian ad litem in wrongful death litigation involving the death of the children's mother. The father contended that as the children's sole custodial parent, he had the right to decide what person is best qualified to represent his minor children. (*Id.* at p. 48.) In disagreeing with the father, the court discussed the limited role of the guardian ad litem, who is appointed " ' "merely to aid and to enable the

---

[4] A guardian ad litem acts as another's "representative of record and . . . representative of the court. [Citation.]" (*Sarracino v. Superior Court* (1974) 13 Cal.3d 1, 13 [118 Cal.Rptr. 21, 529 P.2d 53].) A guardian ad litem is usually appointed to represent "the interests of a person in legal proceedings who lacks capacity to represent himself or herself in those proceedings." (*J.W. v. Superior Court* (1993) 17 Cal.App.4th 958, 965 [22 Cal.Rptr.2d 527].) The guardian ad litem has no power to compromise the rights of a ward unless it is determined by the court that the corporation's rights are fully protected. (*Whitten v. Dabney, supra*, 171 Cal. at p. 632 ["The court and not the guardian *ad litem* has the power to compromise the rights of minors under suitable circumstances."]; see *Spellacy v. Superior Court* (1937) 23 Cal.App.2d 142, 148 [72 P.2d 262] [guardian ad litem for corporation "could not dismiss the action in his fiduciary capacity as to the corporation until he had first received the sanction of the trial court"]; *Regency Health Services, Inc. v. Superior Court* (1998) 64 Cal.App.4th 1496, 1504 [76 Cal.Rptr.2d 95] ["A guardian ad litem is an officer of the court and hence is subject to the court's supervision . . . ."].) Thus, the power of a guardian ad litem is limited.

court to perform [its] duty of protection." ' [Citations.]" (*Id.* at pp. 49–50.) In so doing, the court specified, "[a] guardian ad litem does not replace the parental function, but merely oversees the attorney's work to ensure the child's legal interests are protected." (*Id.* at p. 51.) It is clear from the context of this statement that the attorney the guardian ad litem is charged with overseeing is the independent attorney for the *child*, not an attorney representing the guardian himself.[5] Walton has no attorney-client relationship with Arnon, therefore Shen cannot be charged with overseeing any such relationship.

Similarly, in *County of Los Angeles v. Superior Court* (2001) 91 Cal.App.4th 1303, 1311 [111 Cal.Rptr.2d 471], two minors had been appointed independent counsel (IC) to investigate claims of abuse. The IC never filed any claim or complaint on the minors' behalf. (*Id.* at pp. 1306–1307.) When the IC was replaced, the minors' claims were untimely filed. The minors argued that their time within which to present a claim was tolled due to the juvenile court's error in failing to appoint a guardian ad litem to represent their interests. The Court of Appeal agreed, holding "the juvenile court should have appointed a guardian ad litem to oversee the work being done by the IC, and it should have done so shortly before or after the IC was appointed." (*Id.* at p. 1311, fn. omitted.) The case does not suggest that under the circumstances of this case, Walton has unwittingly stepped into an attorney-client relationship with the corporation.

In sum, the language in certain cases suggesting that Shen is acting as a guardian ad litem for Arnon in the derivative action does not convince us that Walton's attorney-client relationship with Shen automatically creates an attorney-client relationship between Walton and Arnon.

## V. *The foreign authority cited by Miller is not persuasive*

Miller cites four federal cases. Although Miller has failed to demonstrate that these cases should be considered persuasive authority under California law on the issues discussed therein, we briefly address them and find them distinguishable.

---

[5] *In re Nicole H.* (2011) 201 Cal.App.4th 388 [134 Cal.Rptr.3d 261] also makes it clear that the role of a minor's guardian ad litem in adversarial litigation is to ensure that the *minor's* attorney is attentive to the minor's case. (*Id.* at p. 403 ["the guardian ad litem must oversee counsel's work to make sure the minor's case 'does not languish under the press of [counsel's] other cases' "]; see *Sarracino v. Superior Court, supra,* 13 Cal.3d at p. 13 ["A guardian ad litem who appears for an incompetent person in an action or proceeding does not thereby become a party to that action or proceeding any more than the *incompetent person's attorney of record* is a party. . . . The guardian ad litem, like the attorney, *is both the incompetent's* representative of record and a representative of the court."] (citation & fn. omitted, italics added).)

In *In re Dayco Corp. Derivative Securities Litigation* (S.D. Ohio 1984) 102 F.R.D. 624 (*Dayco*), stockholders of Dayco Corporation sued the corporation, 12 directors of Dayco, and a Dayco employee for various violations of federal and state laws. The claims were both direct and derivative. The plaintiffs' lawyer, Cole, was simultaneously representing a former employee of Dayco in a state court wrongful termination action. The former employee alleged that he was wrongfully terminated because he refused to participate in preparing improper financial statements concerning the events which were the subject of the federal action. (*Id.* at p. 626.)

Dayco moved to disqualify Cole as attorney for the plaintiffs in the federal action, claiming that he had a conflict because he was simultaneously representing clients with different interests. Those clients were Dayco, the real party in interest plaintiff in the derivative action, and the former employee suing Dayco in state court. (*Dayco, supra,* 102 F.R.D. at pp. 626–627.)[6]

In denying the motion, the district court acknowledged that Dayco's arguments had "surface appeal." (*Dayco, supra,* 102 F.R.D. at p. 630.) Nevertheless, it pointed out that "the case law is virtually unanimous in holding that one counsel can represent a stockholder bringing *both* an individual *and* a derivative action." (*Ibid.,* fn. omitted.) The court also noted that this result "is supported by the practicalities of most individual and derivative stockholders suits. . . . [I]t seems likely that Plaintiffs would, as a practical matter, wish to join their individual and derivative suits, and obtain one counsel to represent them on both." (*Id.* at fn. 7.)

Similarly, here, Shen's individual and derivative claims revolve around the " 'same nucleus of facts' " alleging "misconduct by corporate mismanagement." (*Dayco, supra,* 102 F.R.D. at p. 630.) Under these circumstances, as the *Dayco* court confirmed, the distinction between individual and derivative claims is "a theoretical one, not rooted in the realities of most individual and derivative suits." (*Ibid.*) This reasoning supports the trial court's order denying Miller's motion to disqualify Walton under the circumstances of this case.

Miller also cites *Ruggiero v. American Bioculture, Inc.* (S.D.N.Y. 1972) 56 F.R.D. 93 (*Ruggiero*). In *Ruggiero,* Freed and Liss filed a derivative action against certain officers and directors of American Bioculture, charging them with diverting assets. Freed and Liss later added a class action cause of action

---

[6] Although characterizing Dayco's motion to disqualify as " 'red herrings' " intended to " 'delay and harass' " the prosecution of the lawsuits, Cole voluntarily withdrew from representation of the former employee. (*Dayco, supra,* 102 F.R.D. at p. 627.) The court thus analyzed the matter as a successive representation case. (*Id.* at p. 628.)

based on violations of federal securities laws. Ruggiero later filed a class action lawsuit alleging violations of securities laws, which was conditionally designated a class action on behalf of all persons who purchased American Bioculture stock between September 30, 1968, and December 29, 1971. (*Id.* at p. 94.)

At issue in *Ruggiero* was the motion of Freed and Liss to declare their action a class action and consolidate it with Ruggiero's class action. The court found that it could not reconcile the positions of Freed and Liss as current shareholders suing derivatively on behalf of the corporation and, at the same time, seeking recovery from the corporation as representatives of a class. The court failed to see "how, on the one hand, they can vigorously seek recovery on behalf of those who have an equity interest in the corporation and, on the other hand vigorously seek recovery from the corporation on behalf of those who have no equity interest in the corporation. [Citations.]" (*Ruggiero, supra*, 56 F.R.D. at p. 95.) The court further noted that there was a substantial question as to whether the attorneys for the Freed plaintiffs could represent them in the derivative suit and the class action without violating the canons of ethics. (*Ibid.*) In its final order, the court directed counsel for the Freed-Liss plaintiffs to "limit their representation to the derivative claim for the benefit of [American] Bioculture." (*Id.* at p. 96.)

In this matter, there is no class action by current and former shareholders against Arnon. Arnon is a corporation that has only two shareholders. Shen, who still owns his share of Arnon, is not seeking to be a class representative on behalf of former stockholders in a lawsuit against Arnon. The situation is factually distinguishable, and provides no support for Miller's position in this case.

Next, Miller cites *Hawk Industries, Inc. v. Bausch & Lomb, Inc.* (S.D.N.Y. 1973) 59 F.R.D. 619 (*Hawk*). As in *Ruggiero*, *Hawk* involved a class action on behalf of an estimated 400 to 500 persons who had purchased Bausch & Lomb stock within a certain timeframe. (*Id.* at pp. 623–624.) As in *Ruggiero*, the court found that counsel who had filed a derivative suit on behalf of Bausch & Lomb in state court could not simultaneously represent a class action against the company. (*Hawk, supra*, at pp. 623–624.) The situation is not comparable to the one before us, where a 50 percent shareholder has brought both individual and derivative claims based on the same set of facts. Under these circumstances, according to the *Dayco* court, "the case law is virtually unanimous in holding that one counsel can represent a stockholder bringing *both* an individual and a derivative action." (*Dayco, supra*, 102 F.R.D. at p. 630, fn. omitted.)

Finally, Miller cites *Stull v. Baker* (S.D.N.Y. 1976) 410 F.Supp. 1326 (*Stull*). Like *Ruggiero* and *Hawk, Stull* involved a derivative action and a class action. The court commented: "As a number of federal judges, including myself, have recently commented, it is difficult to understand how an attorney can properly represent the interests of a corporation and its present shareholders in a derivative action brought on their behalf, and, at one and the same time, properly represent its present and/or former shareholders in a class action against the corporation, without compromising his independence of professional judgment and loyalty to these two groups of clients with potentially conflicting interests." (*Stull, supra,* 410 F.Supp. at pp. 1336–1337.)

As discussed above, the situation is not comparable to the one before us. Shen is not a former shareholder, nor does he seek to represent a class including any such individuals. The potential conflicts noted by the judges in *Ruggiero, Hawk,* and *Stull* do not exist in this matter.

In sum, despite his citation to 48 cases throughout his opening brief, Miller has failed to cite a single case where it was held that an attorney was properly disqualified under facts analogous to those before us.[7]

## VI. *Walton is not subject to disqualification based on a duty of fidelity or confidentiality*

Miller argues that even in the absence of an attorney-client relationship between Walton and Arnon, Walton nevertheless is subject to disqualification because there is an expectation that Walton owes a duty of fidelity or

---

[7] The one case that the parties cite that appears most factually analogous to the matter before us is *Gonzalez ex rel. Colonial Bank v. Chillura* (Fla.Dist.Ct.App. 2004) 892 So.2d 1075, decided under Florida law. There, Gonzalez brought a shareholder derivative action for and on behalf of Colonial Bank as well as individual claims against the corporation. The same lawyer represented Gonzalez in three actions: a shareholder derivative action in which the lawyer represented Gonzalez " 'for and on behalf of' [the corporation]," and two federal cases in which Gonzalez sued Colonial. (*Id.* at p. 1077.) Both Gonzalez's lawyer and the chief executive officer of Colonial Bank filed declarations stating that Gonzalez's lawyer had never consulted with the corporation and neither party had ever agreed to an attorney-client relationship. (*Ibid.*) In reversing the trial court's motion granting a motion to disqualify Gonzalez's counsel, the Florida Court of Appeal stated: "If the mere fact of pursuing a derivative claim that belongs to a corporation, but which the corporation has refused to bring, were enough to establish an attorney-client relationship between the corporation and the lawyer for the derivative plaintiff, there would be no way for the derivative plaintiff to ever have conflict-free counsel." (*Id.* at p. 1078.) However, Shen provides no showing that Florida law governing the formation of attorney-client relationships is analogous to California law on this topic, therefore we decline to consider the case further.

confidentiality to the corporation. As set forth below, we find that the authorities Miller cites do not suggest that such a duty subjects Walton to disqualification in this matter.

Miller relies primarily on *William H. Raley Co. v. Superior Court* (1983) 149 Cal.App.3d 1042 [197 Cal.Rptr. 232] (*Raley*) and *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft* (1999) 69 Cal.App.4th 223 [81 Cal.Rptr.2d 425] (*Morrison Knudsen*).

■ In *Raley*, a law firm representing a plaintiff in a breach of lease lawsuit had a conflict because one of the law firm's partners was director of a bank which managed a trust of the defendant's property. In finding that a conflict of interest existed, the court noted that " '[a] conflict of interest . . . may arise from an attorney's relationship with a nonclient. Such a conflict of interest may arise [1] where an attorney's relationship with a person or entity creates an expectation that the attorney owes a duty of fidelity. It may also arise [2] where the attorney has acquired confidential information in the course of such a relationship which will be, or may appear to the person or entity to be, useful in the attorney's representation in an action on behalf of a client.' [Citation.]" (*Raley, supra*, 149 Cal.App.3d at p. 1047.) The court found that both of the situations described above existed, in that the partner's duties on behalf of the bank required him to make every reasonable effort to maximize the trust's assets and focus on the weaknesses of the plaintiff's case. (*Ibid.*) In addition, the conflict of interest was exacerbated by the partner's "ongoing accessibility to confidential information about [the defendant] which may be pertinent to [the plaintiff's] lawsuit." (*Id.* at pp. 1047–1048.)

Walton holds no similar relationship with Arnon. He is not a director of any bank involved with Arnon. Nor does he have "ongoing accessibility" to any confidential information of Arnon.[8] *Raley* does not suggest that disqualification is appropriate here.

In *Morrison Knudsen*, a law firm sought to represent the Contra Costa Water District in litigation against a subsidiary of Morrison Knudsen. The conflict arose from the law firm's ongoing representation of Morrison Knudsen's insurance underwriters in matters involving Morrison Knudsen. (*Morrison Knudsen, supra*, 69 Cal.App.4th at pp. 226–227.) In this role, the

---

[8] As explained in the factual background portion of this opinion, Walton's client in this matter alleges that he was locked out of the Arnon offices; that his access to Arnon's electronic files and bank accounts has been eliminated; and that Arnon is being operated as if Shen were no longer an officer or director. Under these alleged circumstances, there can be no concern that Walton has an ongoing access to confidential information of the company.

law firm received "detailed confidential communications from Morrison's defense counsel concerning the progress of cases and Morrison's potential liability." (*Id.* at p. 227.) The trial court found that due to the firm's prior representation of Morrison Knudsen, and its current role as monitoring counsel for Morrison's underwriters, the law firm should be presumed to possess confidential information which would be useful to the district in connection with its claim against Morrison Knudsen's subsidiary. (*Id.* at p. 229.) The Court of Appeal agreed, finding that there was sufficient similarity between the current matter and the matters on which the law firm provided counsel for the underwriters of Morrison Knudsen's insurers; that the nature and extent of the law firm's involvement in those cases was substantial; and that as monitoring counsel, the law firm had "considerable exposure to Morrison's litigation policies and strategies." (*Id.* at pp. 235–236.)

Again, the facts of *Morrison Knudsen* do not resemble the facts of this case. There is no evidence that Walton formerly represented Arnon, or has any relationship with its insurers. The case does not suggest that a duty of loyalty or confidentiality prevents Walton's representation of Shen in this matter.

Finally, *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1 [60 Cal.Rptr.2d 207], involved an attorney who admitted that he offered to sell out his client and the class which the client was seeking to represent for a payment to himself personally of approximately $8 million to $10 million. (*Id.* at pp. 5–6.) The Court of Appeal's decision to affirm the trial court order disqualifying the attorney for this ethical lapse has no bearing on the matter before us.[9]

In sum, Miller has failed to convince us that Walton has a duty of loyalty or confidentiality to Arnon which prevents Walton from representing Shen in the current matter.

---

[9] Miller cites three more cases that are not relevant to the issue before us in this matter. *Janik v. Rudy, Exelrod & Zieff* (2004) 119 Cal.App.4th 930 [14 Cal.Rptr.3d 751] involved the obligation of counsel for a class to adequately represent the members of the class. *Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1111, footnote 7 [72 Cal.Rptr.3d 129, 175 P.3d 1184], involved the obligation to maintain continuous stock ownership throughout the pendency of a derivative action. These cases do not bolster Miller's position. Nor does *Streit v. Covington & Crowe* (2000) 82 Cal.App.4th 441 [98 Cal.Rptr.2d 193]. That case suggests that "agency principles are used primarily to indicate the nature and extent of the attorney's authority. [Citation.]" (*Id.* at p. 446.) However, Miller omitted the italicized portion of the following sentence, which he quoted in his reply brief: "*If an agent is authorized by the principal to employ a subagent*, the subagent owes the same duties to the principal as does the agent. [Citations.]" (*Id.* at fn. 3, italics added.) Arnon has not authorized Shen to hire Walton on its behalf, therefore the quoted sentence does not apply.

## DISPOSITION

The order is affirmed. Shen is entitled to his costs of appeal.

Boren, P. J., and Ashmann-Gerst, J., concurred.